## Docket No. 24-7498

# In the United States Court of Appeals
# For the Ninth Circuit

In re: VALVE ANTITRUST LITIGATION:

WOLFIRE GAMES, LLC, SEAN COLVIN, SUSANN DAVIS, RYAN LALLY,
HOPE MARCHIONDA, EVERETT STEPHENS, DARK CATT STUDIOS
HOLDINGS, INC., DARK CATT STUDIOS INTERACTIVE, LLC,

*Plaintiffs-Respondents,*

v.

VALVE CORPORATION,

*Defendant-Petitioner.*

*On Petition for Appeal from a Decision of the United States District Court*
*for the Western District of Washington · No. 2:21-cv-00563 · Honorable Jamal N. Whitehead*

## RESPONSE TO PETITION FOR PERMISSION
## TO APPEAL PURSUANT TO FRCP 23(F)
### [REDACTED]

KENNETH R. O'ROURKE
WILSON SONSINI
1700 K Street NW, Fifth Floor
Washington, District of Columbia 20006-3814
(202) 973-8800
korourke@wsgr.com

JOSEPH C. BOURNE
JOSEPH W. BRUCKNER
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
(612) 339-6900
jcbourne@locklaw.com
wjbruckner@locklaw.com

ANKUR KAPOOR
CONSTANTINE CANNON
6 East 43rd Street, 26th Floor
New York, New York 10017
(212) 350-2748
akapoor@constantinecannon.com

DAVID M. COOPER
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7141
davidcooper@quinnemanuel.com

ADAM WOLFSON
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
adamwolfson@quinnemanuel.com

*Attorneys for Respondents Wolfire Games, LLC,*
*Dark Catt Studios Holdings, Inc., Dark Catt Studios Interactive, LLC*

 

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Respondent Wolfire Games, LLC ("Wolfire Games") states that it has no parent corporation and no publicly held corporation owns more than 10% of Wolfire Games.

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Respondent Dark Catt Studios Holdings, Inc. ("DCS Holdings") states that it has no parent corporation and no publicly held corporation owns more than 10% of DCS Holdings.

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Respondent Dark Catt Studios Interactive LLC ("DCS Interactive") states that it is a wholly owned subsidiary of DCS Holdings.

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................1

ARGUMENT ....................................................................................3

I.    THE DISTRICT COURT APPLIED THE CORRECT LEGAL
      STANDARD AND THERE IS NO BASIS FOR RULE 23(f)
      REVIEW .................................................................................3

II.   THE DISTRICT COURT CORRECTLY FOUND COMMON
      ISSUES WOULD PREDOMINATE ...........................................8

      A.    Valve's Argument About Effective Revenue Shares Is
            Erroneous And Fails To Defeat The Predominance Of Common
            Issues ............................................................................10

      B.    Valve's Argument About Pass-Through Is Erroneous And Fails
            To Defeat The Predominance Of Common Issues............................16

CONCLUSION..................................................................................22

CERTIFICATE OF COMPLIANCE.......................................................24

DECLARATION OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................ 5

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ................................................................ 6

*Armstrong v. Brown*,
    768 F.3d 975 (9th Cir. 2014) .............................................. 12

*In re Brewer*,
    863 F.3d 861 (D.C. Cir. 2017) ......................................... 4-5

*In re Broiler Chicken Grower Antitrust Litig. (No. II)*,
    2024 WL 2117359 (E.D. Okla. May 8, 2024) .................... 21

*Chamberlan v. Ford Motor Co.*,
    402 F.3d 952 (9th Cir. 2005) ........................................... 3, 4

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ............................................... 6

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) .............................................. 15

*In re Glumetza Antitrust Litig.*,
    336 F.R.D. 468 (N.D. Cal. 2020) ...................................... 13

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972) .............................................................. 13

*Illinois Brick. Apple Inc. v. Pepper*,
    587 U.S. 273 (2019) .............................................................. 17

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) .............................................................. 17

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    791 F.2d 1356 (9th Cir. 1986) ........................................... 13

*Lytle v. Nutramax Lab'ys, Inc.*,
    99 F.4th 557 (9th Cir. 2024) ...................................................................8

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap*
    *Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020) ...............................................................21

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015).......................................................................13

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)................................................................................17

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ...............................................1, 7, 8, 15, 16, 21

*Sidibe v. Sutter Health*,
    333 F.R.D. 463 (N.D. Cal. 2019)............................................................21

*Siegel v. Chicken Delight, Inc.*,
    448 F.2d 43 (9th Cir. 1971) ...................................................................14

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)............................................................................7, 22

## Statutes / Rules

Fed. R. Civ. P. 23 .............................................................................................5

Fed. R. Civ. P. 23(a)........................................................................................5

Fed. R. Civ. P. 23(b)(3)........................................................................5, 6, 8, 21

Fed. R. Civ. P. 23(f)..............................................................................1, 3, 4, 8

## **INTRODUCTION**

Valve's Petition provides no reason why this should be the rare case where this Court grants interlocutory review. The only basis for Rule 23(f) review Valve claims to satisfy is "manifest error." However, "manifest error" is an extraordinarily high bar, generally met only where there is a clear conflict with precedent. There is no such conflict here. Indeed, this Court's settled precedent in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (*en banc*), is directly on point. Here, just as in *Olean*, the District Court correctly held that antitrust impact was capable of classwide resolution despite the scattershot criticisms of Plaintiffs' expert's analysis. The application of this settled law to the facts here does not warrant interlocutory review.

Furthermore, the District Court carefully analyzed and correctly rejected the arguments Valve puts forward. Valve's Petition does not dispute that Valve has monopoly power in a well-defined market, that Valve's policy prohibiting publishers from selling video games for a lower price or with better content on other platforms is anticompetitive and maintained Valve's monopoly, that this policy applied to all class members, and that absent this anticompetitive conduct, there would be greater competition in the market. The Petition raises two issues— the effect of Steam Keys and pass-through—but Valve simply ignores the District Court's findings on these issues.

1

For Steam Keys, the District Court found: "If anything, to maintain its competitive position [in the but-for world absent the anticompetitive conduct], Valve would need to provide more Keys than it does now." Op. 13. That finding disposes of Valve's argument, which is based on the supposition that Valve might provide fewer or no Steam Keys in the but-for world, thereby offsetting the lower commissions. For pass-through, the District Court found that "companies are highly likely to retain at least a portion of their savings" rather than passing on all of the benefit of reduced commissions to consumers. Op. 15. That finding likewise disposes of Valve's argument because if publishers retain any of the benefit of lower commissions, *e.g.*, do not pass on all the savings, they suffer antitrust injury.

Valve does not argue that the District Court abused its discretion in reaching those findings. Nor could Valve make such an argument, because Valve's own expert did not opine that Steam Keys would be reduced in the more competitive, but-for world, or that publishers would pass on to consumers every cent of reduced commissions. In any event, both of those issues concern only whether the jury will ultimately accept Plaintiffs' common evidence; they do nothing to undermine the fact that Plaintiffs' claims are *capable* of classwide resolution, which is all *Olean* and Supreme Court precedents require.

2

In sum, Valve's Petition asks this Court to resolve factual disputes where (a) Valve ignores the District Court's findings, (b) Valve identifies no abuse of discretion (or manifest error), and (c) the issues can be properly resolved by the jury based on classwide evidence. This Court should deny interlocutory review.

## **ARGUMENT**

### I.  THE DISTRICT COURT APPLIED THE CORRECT LEGAL STANDARD AND THERE IS NO BASIS FOR RULE 23(f) REVIEW

"Rule 23(f) review should be a rare occurrence" and "granted sparingly." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 955, 955, 959 (9th Cir. 2005). This Court has announced three potential bases for Rule 23(f) review: "(1) there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision that is questionable; (2) the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; or (3) the district court's class certification decision is manifestly erroneous." *Id.* at 959. None of these bases is present here.

Valve does not argue that the District Court's certification decision represents a "death-knell situation" for Valve. Nor does Valve put forward "declarations, documents, or other evidence" regarding its financial condition, as required to show "ruinous" liability if it did not settle. *See id.* at 960. And for

3

good reason. Valve is one of the most profitable companies in the country, with billions in annual revenue. ECF 343 ¶¶143-149. Thus, Valve can pay any judgment—even a large one—and class certification is not the "death knell" of the case. *See Chamberlan*, 402 F.3d at 959, 957, 960 (rejecting Rule 23(f) review where "the potential recovery … may be 'unpleasant to a behemoth' company," but "is hardly terminal") (citation omitted).[1]

Valve also does not argue that there is some "unsettled and fundamental issue of law" here that is "likely to evade end-of-the-case review." *Id.* at 959. Indeed, there is none. The District Court's opinion reflects the application of settled law to the facts of this litigation.

That leaves only "manifest error," *id.*, a standard that Valve mentions in its headings, Pet. 8, 15, but does not describe. This is an extraordinarily high bar, meant for clear legal errors. An error is "manifest" "only when the certification decision is … virtually certain to be reversed on appeal from the final judgment." *Chamberlan*, 402 F.3d at 962. "It is difficult to show that a class certification order is manifestly erroneous unless the district court applies an incorrect Rule 23 standard or ignores a directly controlling case." *Id.* at 962; *see also, e.g., In re*

---

[1] Valve presents a "Questions Presented" that asks "Did the District Court *enter a questionable order* or manifestly err …" Pet. 7-8 (emphasis added). But Valve does not argue the decision represents a death knell, as would be needed for a merely "questionable" order to be subject to Rule 23(f) review. In any event, for the reasons discussed below, the order here is not "questionable."

*Brewer*, 863 F.3d 861, 875 (D.C. Cir. 2017) ("The manifest error standard is extremely difficult to meet. To date this court has never held a district court's class certification decision manifestly erroneous.").

There is no question that the District Court applied the correct legal standard and complied with this Court's precedents. The District Court expressly recognized the test of "rigorous analysis" for determining whether the requirements of Rule 23 were satisfied. Op. 16. It then engaged in that rigorous analysis for the factors set out in Rule 23(a) and 23(b)(3), finding there were common issues that would predominate over individualized inquiry. Op. 15-16 (outlining requirements set forth in Rule 23(a) and 23(b)(3)); Op. 17-20 (analyzing numerosity, typicality, adequacy, and superiority, and finding each to be satisfied); Op. 20-25 (finding commonality and predominance requirements satisfied). In particular, the District Court considered, analyzed, and rejected each of the arguments Valve raises in this Petition. Op. 12-15, 23-24. Its findings are consistent with the Supreme Court's recognition that "[p]redominance is a test readily met in certain cases alleging … violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

While Valve purports to challenge the District Court's rigorousness, its actual argument is that the District Court should have resolved the battle of the experts in Valve's favor. Pet. 8-20. The only claimed legal basis for this argument

is a brief assertion that the District Court should have "judg[ed] the persuasiveness of the evidence presented."  Pet. 5 (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)).  However, *Olean* is unequivocal that a court should *not* decide the persuasiveness of the experts at class certification:  "Provided that the evidence is admissible and, after rigorous review, determined to be capable of establishing antitrust impact on a class-wide basis, it is for the jury, not the court, to decide the persuasiveness of [the expert's] evidence in light of 'common sense and empirical evidence.'"  *Id.* at 678; *see also id.* at 667 ("[A] district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue.").

*Olean* held that *Ellis* was limited to deciding "historical facts," not (as Valve would propose here) "ultimate issues on the merits." *Id.* at 667.  This conclusion directly follows from Supreme Court precedent:  "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be *answered*, on the merits, in favor of the class."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (second emphasis added).  And this principle applies to expert evidence:  "Reasonable minds may differ as to" the strength of challenges to the expert evidence, but "[o]nce a district court finds

evidence to be admissible, its persuasiveness is, in general, a matter for the jury." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016).

The District Court's approach here—considering Valve's arguments, finding Plaintiffs' common evidence reasonable and admissible, and concluding that antitrust injury is capable of proof on a classwide basis—is *exactly* what this Court approved in *Olean*. Indeed, Valve's criticisms are materially identical to those this Court rejected as irrelevant to class certification. In *Olean*, the defendants argued that there were "overcharges both above and below the overcharge indicated by [plaintiffs' expert's] model," but this Court "reject[ed] this argument, because it improperly conflates the question whether evidence is capable of proving an issue on a class-wide basis with the question whether the evidence is persuasive." 31 F.4th at 679. Likewise, here, Valve's argument that Plaintiffs' evidence is wrong that all class members were overcharged ignores the point that this issue is *capable* of proof on a classwide basis.

In sum, there is no legal dispute here, as the District Court applied the standard that *Olean* set forth. Valve's Petition thus boils down to an argument that the District Court was wrong in finding that antitrust impact was capable of common proof given the evidence here. But Valve does not explain how that fact-specific decision could constitute manifest error, nor mention the standard of review: abuse of discretion. *Olean*, 31 F.4th at 663. In particular, this Court

7

"review[s] the question of whether an expert's damages model 'is capable of showing class-wide impact, thus satisfying one of the prerequisites of Rule 23(b)(3) of the Federal Rules of Civil Procedure, for an abuse of discretion.'" *Lytle v. Nutramax Lab'ys, Inc.*, 99 F.4th 557, 569 (9th Cir. 2024) (quoting *Olean*, 31 F.4th at 663). Valve fails to show an abuse of discretion, let alone a manifest error that would warrant Rule 23(f) review, where the District Court rigorously analyzed the arguments Valve presents here and concluded that "Plaintiffs establish a common antitrust injury: inflated Steam Store commissions that all class members must pay." Op. 24. In any event, as discussed below, the District Court's analysis was correct.

## II.    THE DISTRICT COURT CORRECTLY FOUND COMMON ISSUES WOULD PREDOMINATE

To demonstrate that a reasonable jury could find classwide impact and damages, Plaintiffs rely on the analysis of economic expert Dr. Steven Schwartz. ECF 343. Dr. Schwartz explained that platforms in this market compete on two sides:  for both publishers and consumers. ECF 343 ¶205. On the publisher side, platforms charge publishers a "commission," or "revenue share," that is taken out of every sale made on the platform. *Id.* ¶¶338-339. On the consumer side, consumers purchase the game through the platform, which receives the payment and then distributes the payment net of its commission to the publisher. *Id.*

As Dr. Schwartz explained, Valve's market share exceeds that of all other platforms combined, and Valve maintains its dominance through use of a platform most-favored nations clause ("PMFN"). *Id.* ¶¶130, 150-153. A PMFN prohibits a publisher from charging lower prices or offering different content to consumers on a competing platform. *Id.* ¶152. As a result, a rival platform's strategy to offer lower commissions would be futile—a publisher could not pass through the lower commissions to consumers and thereby steer customers to the rival platform. *Id.* ¶206. This means that Steam, as the incumbent, faces no significant competition on price (or content) from rival platforms, and it can maintain inflated commissions and protect its dominant position. *Id.* ¶¶206, 241-331. Dr. Schwartz conducted a detailed market analysis and concluded that but for Valve's PMFN policy, rival platforms would compete on price, content, and lower commissions, resulting in lower commissions across the board for all publishers. *Id.* ¶¶241-319. Specifically, Dr. Schwartz opined that in a competitive market, Valve's commissions would fall from ███% to 17.7%. *Id.* ¶¶377-78.

Valve's Petition does not contest Dr. Schwartz's opinion that there would be greater competition but for Valve's PMFN Policy. Nor does the Petition suggest that Dr. Schwartz's methodology fails review under *Daubert*. Instead, the Petition makes only two criticisms of Dr. Schwartz's analysis, both of which can be

9

decided by the jury based on classwide evidence and which, in any event, are wrong on the merits.

### A. Valve's Argument About Effective Revenue Shares Is Erroneous And Fails To Defeat The Predominance Of Common Issues

Valve contends the District Court committed "manifest error" by failing to conduct a rigorous assessment of the import of Steam Keys on Plaintiffs' ability to show the classwide impact of Valve's conduct. Pet. 8-15. Not so. The District Court fully considered Valve's Steam Key arguments and correctly rejected them. Op. 12-15, 23-24.

Steam Key transactions are independent of the transactions relevant in this case, *i.e.*, sales taking place in the Steam Store. It is on Steam Store transactions, taking place in Valve's store, that publishers pay supracompetitive commissions to Valve. ECF 348-1 ¶¶176-177. Separately, publishers who agree to sell their games through the Steam Store (subject to Valve's ██% commission structure) are given a number of "Steam Keys" they can distribute to consumers who purchase those games *outside* of the Steam Store from third-party retailers. In that way, consumers who purchase games elsewhere can then play those games on Valve's Steam gaming platform. This means that Valve can bring consumers who have purchased games elsewhere into Steam's orbit, growing the stickiness and network effects of its platform, and increasing the likelihood those consumers will instead buy on Steam in the future. ECF 343 ¶47. Indeed, Valve acknowledges

10

that it uses Steam Keys "[t]o broaden [consumers'] access" to Steam and "help Valve maintain connections with users," and to "encourage third-party publishers to sell games on Steam" (which sales are subject to Valve's █████ % commission). Pet. 2-3.

Importantly, "[e]ach publisher is charged the same commission rate on sales within Steam regardless of any Steam Key distribution." ECF 348-1 ¶177. The number of Steam Keys a given publisher uses therefore has no effect on the price paid to Steam for each sale on the Steam Store, *i.e.*, a █████ % commission.[2]

Valve's argument rests on the premise that Steam Keys would be less generous in the but-for world (without PMFN), Pet. 14-15, and that Plaintiffs must somehow take this into account in determining the impact of Valve's inflated commission on Steam Store sales. But, as the District Court found, this factual premise is completely unsupported. Valve claims it "presented evidence that it has changed Steam Key policies in response to changes in the market," Pet. 15, but Valve did not present (or even mention) any such evidence in its opposition to class certification (or its *Daubert* papers). Nor did Valve assert that Steam Keys would be different in the but-for world. That argument is therefore waived. *See,*

---

[2]  Further, while publishers do not pay commissions to *Valve* for Steam Key sales accomplished through other distribution channels, publishers typically do pay commissions to the alternative distributor on those transactions.  ECF 348-1 ¶¶ 212-13.

*e.g.*, *Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014) ("[A]n issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it.").

Moreover, contrary to Valve's suggestion, Pet. 14, its own expert did not say that Valve would be less generous with Steam Keys in the but-for world. Instead, its expert said that this result was *possible* while providing *no opinion* that it would actually occur. *See* ECF 345 ¶152 & n.206 ("[I]n a but-for world … , that publisher may respond by using Steam keys equally …; less …; or more."). Plaintiffs cite Dr. Langer's statement that "in that but-for world, 'Steam would likely not be able to offer the same set of features to users and publishers[.]'" Pet. 14-15 (citing ECF 345 ¶133). But Dr. Langer does not opine, nor could she, that Valve would be unable to offer Steam Keys in the but-for world.

By contrast, Plaintiffs put forward evidence specifically showing that, in the but-for world, Valve would continue to offer Steam Keys to attract consumers and publishers to its platform. ECF 348-1 ¶¶180-85.[3] As the District Court found, and Valve ignores, "[i]f anything, to maintain its competitive position, Valve would need to provide more Keys than it does now." Op. 13; *see also* ECF 348-1 ¶181 (same). This finding is dispositive: if Steam Keys would be the same or greater in

---

[3] To the extent Valve suggests that it might provide the same number of Steam Keys but not for free, Pet. 14, Valve cites nothing for this proposition and did not argue below that it would charge for Steam Keys in the but-for world.

12

the but-for world, then paying a lower price for Steam Store transactions makes every class member better off in the but-for world. *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1370 (9th Cir. 1986) (damages must be reduced only by "benefits that would not have been received by the plaintiff had there been no violation").

In any event, Valve's argument that Plaintiffs must offset lower commissions in the but-for world with hypothetically fewer Steam Keys is legally and factually erroneous. As the District Court also correctly explained, "there is no legal basis to net the savings provided to the putative class through Steam Keys (sales commissions *not* paid) against Valve's allegedly inflated Steam Store commissions." Op. 13-14 (emphasis in original). "[A]ntitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 481 (N.D. Cal. 2020) (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015)). As the Supreme Court has explained, "courts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 n. 14 (1972). Thus, the District Court correctly rejected Valve's attempt to engage in netting for the purpose of establishing antitrust impact. *All* class members were impacted the moment they paid at least one overcharge to Valve in the Steam Store (which all did).

Valve claims the "*Siegel* rule" mandates the use of Valve's alternative "effective revenue share."  Pet. 12-13.  But *Siegel* concerned a tie between the "free" license of a trademark and the forced purchase of cooking equipment. *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 46-47 (9th Cir. 1971).  Any damages associated with the forced purchase of equipment thus needed to be offset by the free trademark because the two were included in the same transaction.  *Id.* at 52. *Siegel* is irrelevant here, given that Steam Keys are not related to the challenged conduct (*i.e.*, Valve's PMFN Policy), and there is not one tying transaction being challenged.  Valve claims "the core conduct Plaintiffs are challenging" is the "revenue share Valve retains," Pet. 12, but the conduct Plaintiffs challenge is actually Valve's PMFN Policy; the evidence shows that this policy results in inflated Steam Store commissions.

Valve next implies that *Los Angeles Mem'l Coliseum Comm'n* and *Glumetza* relate solely to scenarios where an injury first occurs and a benefit is later realized. Pet. 13-14.  But that exact reasoning applies in full force here.  Valve cannot contest that Steam Store sales are separate from Steam Key sales, *i.e.*, a class member may sell a game through the Steam Store on Day 1 (paying Valve an overcharge), and later sell a game through a Steam Key on Day 45 (paying a commission to an alternative distributor, rather than to Valve).  As to the element

14

of antitrust injury, the fact that Steam Store transactions are independent of Steam Key transactions is dispositive.

Valve's argument for offset is also factually unsupported for other reasons. According to Valve, the court was required to look at the "effective revenue share" by combining Steam Store sales and Steam Keys.   But Valve invented the "effective revenue share" for the purposes of opposing class certification.  No class member has ever paid what Valve calls the "effective revenue share" to anyone. There is no reason why the District Court must accept this invented concept on class certification.  Valve cites *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), Pet. 11-12, but that case discussed "effective commission rate" only to reject Apple's attempt to justify its 30% commission by comparing that to its competitors' *listed* rates rather than their *actual* rates (as they often discounted down to lower prices).  *Epic*, 67 F.4th at 985.  Valve's "effective revenue share" does not reflect any *actual* rates publishers pay.  That is especially true because Valve's assumption that the commission is 0% for Steam Key transactions is also factually incorrect.  As explained, while *Valve* receives no commission on such transactions, the class member publisher typically pays a commission to the alternative distributor.  ECF 348-1 ¶¶212-13.  Finally, this entire inquiry only confirms that Valve's argument creates at most a battle of the experts that should not be resolved on class certification.  *See Olean*, 31 F.4th at 678.  It says nothing

about whether Plaintiffs' claims are *capable* of class-wide resolution. And it certainly does not rise to the level of an abuse of discretion or manifest error.

### B. Valve's Argument About Pass-Through Is Erroneous And Fails To Defeat The Predominance Of Common Issues

Valve also argues that the District Court erred in its analysis of Valve's critiques of Plaintiffs' pass-through analysis. Pet. 15-20. Valve's criticisms are garden-variety disagreements about the merits of Plaintiffs' common damages analysis. The District Court properly found that these fact-intensive, merits critiques do not preclude certification. Op. 14-15, 23-24. In any event, Valve's argument relies on mischaracterizations of the record and the law.

Valve claims that its critiques relate to antitrust injury, rather than antitrust damages, but Valve confuses the issues. Pet. 15. Antitrust injury is distinct from antitrust damages. *See Olean*, 31 F.4th at 666, 668-69. Individualized issues regarding the amount of damages do not defeat class certification, and thus, "the question is whether each member of the class can rely on [the evidence] to show antitrust impact of any amount." *Id.* at 679. Dr. Schwartz offers three separate and independently sufficient methods and analyses, each of which proves that all class members were injured (but does not prove, alone, by how much). ECF 343 ¶¶243-44 ((1) "a Platform Competition Model, which shows that parity enforcement by an incumbent platform like Valve leads to higher platform fees, deters entry by rivals, and increases consumer prices"; (2) "a 'yardstick approach'

16

to evaluate comparable markets and explain how platform fees in those other markets compare to Steam's commission rate"; and (3) "empirical evidence from the PC gaming market to determine the impact of limited (and ultimately transitory) outbreaks of competition"). Valve challenges none of these analyses in its Petition, and none depends on Dr. Schwartz's pass-through analysis in any way. Given that Valve's pass-through argument is irrelevant to several bases for proving classwide injury through common evidence, Valve cannot show any error, let alone abuse of discretion or manifest error, in certifying the class.

In fact, Valve's pass-through argument is relevant only to damages, not antitrust injury. Dr. Schwartz's pass-through analysis is one step in Plaintiffs' common methodology for proving classwide *damages*. "Pass-through" in this context differs from "pass-on" in the indirect-purchaser context. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977). In two-sided markets like this one, both the buyer and seller of the good are "direct purchasers" under *Illinois Brick*. *Apple Inc. v. Pepper*, 587 U.S. 273, 287-88 (2019); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 545-46 (2018) (where the market at issue involves the facilitation of a transaction between two market stakeholders, it is properly defined as a two-sided transaction market). But, as in *Pepper*, Valve only charges a price—the commission—to one side of the platform, the developers. ECF 343 ¶339. Developers then pass on some of Valve's commission to consumers, in the form of

17

higher prices on games. *Id.* ¶379. Pass-through in this context is therefore a damages allocation issue, determining how damages are allocated between the two sets of direct purchasers of the platform.

For any publisher, Dr. Schwartz's damage methodology works as follows: (1) calculate an overcharge percentage for that publisher, (2) apply that overcharge percentage to the actual associated revenues for that publisher, and (3) reduce the total overcharge by Dr. Schwartz' estimated pass-through rate. *Id.* ¶402. Notably, the pass-through portion of this analysis can only reduce damages, making it a highly conservative component of the overall analysis. *Id.* Further, Dr. Schwartz's analysis does not ascribe any damages to publishers with lost sales, even though Valve's supracompetitive commission reduces all publishers' sales volumes. *Id.* ¶405. At each step, including the pass-through analysis, Dr. Schwartz relies on Valve's real-world pricing data to estimate damages. *Id.* ¶390. And this methodology can be used to calculate damages for any individual class member. *See, e.g.*, *id.* ¶¶406-407 (sample calculations for the class representatives).

Dr. Schwartz's pass-through analysis would be relevant to classwide impact only if pass-through were 100%, because only in that circumstance would a publisher have passed on the entire overcharge to the consumer. ECF 348-1 ¶253. But even in this circumstance, publishers still would be injured by having lost sales volume as a result of having to charge higher prices to consumers, reducing output.

18

*Id.* ¶257.   Regardless, both the District Court and Dr. Schwartz appropriately considered that possibility.   ECF 343 ¶379; Op. 14.   One hundred percent pass-through occurs only in "specialized, extreme cases, the conditions for which are unlikely to be met here."   ECF 348-1 ¶231.   As Dr. Schwartz explains, the conditions for full pass-through are not met in this market, which is not perfectly competitive, *id.* ¶253, and which experiences substantial focal point pricing,[4] *id.* ¶246, issues that Valve's own expert did not even attempt to analyze, *id.* ¶¶251, 256.   At bottom, Valve's argument is the publishers will be worse off if their commission costs were reduced substantially; this argument defies common sense. *Id.* ¶256.   Accordingly, the District Court found that "companies are highly likely to retain at least a portion of their savings." Op. 15.  Valve ignores this finding and presents no basis to treat this finding as an abuse of discretion, let alone manifest error.

Valve advances only baseless contrary arguments.  Pet. 19.  *First*, Valve claims that its expert opined that "100% pass-through is 'quite common.'"  Pet. 19 (quoting ECF 364 ¶34 n.71).  However, Valve's expert did *not* opine that 100% pass-through would occur in this market or provide any analysis to support such a conclusion.  The one footnote cited in the Petition merely states that "pass-through

---

[4]   Focal point pricing is a pricing strategy in which firms set prices at "focal points," such as setting prices that end in .99.  ECF 343 ¶ 386.

above 100 percent cannot be ruled out theoretically," citing articles discussing "alcohol taxes," "cigarette taxes," and "fuel taxes." ECF 364 ¶34 n.71. In short, Valve's own expert does not support the proposition that game publishers would pass along every cent of increased commissions to customers.

*Second*, Valve relies on individual data points in a sample that Dr. Schwartz analyzed. Pet. 19. However, it is nonsensical to look at those data points individually because, as Dr. Schwartz explained, those individual price reductions resulted from non-commission factors and therefore cannot be ascribed entirely to pass-through. ECF 348-1 ¶240 ("Each of these games had a base price drop that did not coincide with its corresponding change in commission."). Valve's argument thus violates basic principles of statistics, and merely captures one-off discrepancies—like a game going on sale shortly before a revenue-tier change occurs. ECF 348-1 ¶¶235-43.

Valve's expert does not state that these individual data points actually reflect 100% pass-through, or respond to Dr. Schwartz's explanation of the effect of non-commission factors, but instead only criticizes Dr. Schwartz's averaging methodology. *See* ECF 345 ¶114 & n.139. However, there is no legal basis to treat this methodological challenge as a bar to class certification, *see supra*, especially given that it concerns only damages, *see supra* at 16-17. Regardless, Valve's suggestion that averaging is only permissible in regression models is

20

incorrect. As *Olean* explains, "[p]laintiffs frequently offer expert evidence, including statistical evidence *or class-wide averages*, to prove that they meet the prerequisites of Rule 23(b)(3)." 31 F.4th at 665 (emphasis added). In particular, "antitrust cases have recognized the use of averaging in calculating passthrough rates where experts have shown the sound methodological steps through which they calculated their averages." *Sidibe v. Sutter Health*, 333 F.R.D. 463, 495 (N.D. Cal. 2019).

Dr. Schwartz provided exactly those sound methodological steps for averaging. His analysis is based on a natural experiment, which empirically tests whether publishers would pass on commission savings to consumers. ECF 343 ¶¶386-97. He found that publishers would pass on some, but not all, savings. *Id*. ¶397. His finding is fully consistent with the relevant economic literature. *Id*. ¶¶382-84.

Experts commonly use natural experiments to draw inferences regarding competitive effects in antitrust cases, *see, e.g., In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1250, 1257-58 (9th Cir. 2020) (affirming district court's reliance on natural experiments), and district courts commonly and properly rely on those inferences in certifying class actions, *In re Broiler Chicken Grower Antitrust Litig. (No. II)*, 2024 WL 2117359, at *18, 20 (E.D. Okla. May 8, 2024) (rejecting *Daubert* challenge to economist analyzing

21

a "natural experiment" to demonstrate classwide impact). Similarly, while Valve challenges the representativeness of the data, Pet. 16-18, Valve omits that Valve's commission change did not apply to all games, such that only a limited number of games were available for the analysis, ECF 343 ¶392, and Dr. Schwartz properly winnowed his dataset to eliminate confounding factors, thus focusing on the subset of games with the most reliable data available. *Id*. ¶¶393-94.

The District Court acted well within its discretion in accepting this averaging methodology as "reliable" and consistent with "what other courts have permitted in a similar context." Op. 15. And the District Court correctly held, consistent with *Tyson* and *Olean*, that the correctness of a particular averaging methodology is a question for the jury. The critical point now is simply that pass-through (and certainly the existence of less than 100% pass-through) is *capable* of resolution based on classwide evidence.

## **CONCLUSION**

This Court should deny the Petition for interlocutory review of the District Court's order granting class certification.

22

Dated:  December 20, 2024          Respectfully submitted,

                     */s/ David M. Cooper*

David M. Cooper
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue
New York, New York 10010
Telephone:  (212) 849-7000
davidcooper@quinnemanuel.com

Adam B. Wolfson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
adamwolfson@quinnemanuel.com

Kenneth R. O'Rourke
WILSON SONSINI
1700 K Street NW, Fifth Floor
Washington, District of Columbia 20006-3814
Telephone: (202) 973-8800
korourke@wsgr.com

Joseph C. Bourne
Joseph W. Bruckner
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Telephone:  (612) 339-6900
jcbourne@locklaw.com
wjbruckner@locklaw.com

Ankur Kapoor
CONSTANTINE CANNON
6 East 43rd Street, 26th Floor
New York, New York 10017
Telephone:  (212) 350-2748
akapoor@constantinecannon.com

*Counsel for Plaintiffs-Respondents*

23

## CERTIFICATE OF COMPLIANCE

I certify that this Response to Petition for Permission to Appeal complies with the type-volume limitation set forth in Fed. R. App. P. 5(c)(1) and 32(a)(5)(A). This Petition uses a proportional typeface and 14-point font, and contains 5,177 words.

Dated:  December 20, 2024                    Respectfully submitted,

                                                                */s/ David M. Cooper*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 24-7498

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

1. Form 20. Notice of Intent to Unseal; and
2. Response to Petition for Permission to Appeal Pursuant to FRCP 23(f)

**Signature** | /s/ David Cooper    **Date** | 12/20/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*